Gloria SCHIBURSKY, Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Richard Lueck, Shirley Stender, Mary Charlson, Judy Wasser, Paulette Steinberg, Pam Fossey, Erin (Johnson) Butman, Michala Sinning, Paula Graskamp, and Marilyn Aarsvold, Defendants.

Civ. No. 4–92–87.

United States District Court, D. Minnesota, Fourth Division.

May 7, 1993.

Robert J. Brenner, Michael Moline, Tom Fafinski, and Robert Brenner & Associates, P.A., Minneapolis, MN, for plaintiff.

Jerry W. Snider, Theresa H. Keninger, Eric A. Jorstad, and Faegre & Benson, Minneapolis, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the defendants' motion to dismiss and, in the alternative, for summary judgment. Defendants assert that plaintiff has failed to come forward with sufficient evidence to avoid summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court grants the defendants' motion except as to

part of the plaintiff's claim for breach of contract.

## BACKGROUND

Gloria Schibursky ("Schibursky") was 47 years old when International Business Machines Corporation ("IBM") terminated her after 22 years of employment. IBM claims the termination was due to Schibursky's insubordination for failing to record all overtime hours worked as directed by management and required by IBM policy. Schibursky alleges, however, she either was the victim of illegal age discrimination or was fired because she exercised her rights under IBM policy to officially complain about her administrators.

Schibursky began her employment with IBM in Rochester, Minnesota in February 1969. Schibursky was a devoted employee of IBM and was promoted several times during her employment with IBM. At the time of her termination in January 1991, Schibursky was a high level secretary with an annual salary of nearly $50,000.

In October 1988, Schibursky was assigned to IBM's Recording Components Development and Compact Storage Lab division ("RCD and CSL"). Schibursky initially opposed the transfer but soon found she enjoyed working for RCD and CSL. Her primary task was to serve as administrative secretary for 4 chief scientists. Schibursky also provided support for 16 researchers and development scientists and, if needed, extended support to 13 other scientists. The RCD and CSL scientists consistently gave Schibursky high ratings.

Schibursky answered to two different groups within IBM. Although Schibursky worked directly for the RCD and CSL scientists and performed tasks at their direction, she reported directly to managers in IBM's Administrative Services division. Schibursky's position was defined and funded by Administrative Services and her job performance was ultimately evaluated by her man-

agers in that division. Schibursky's job duties were outlined in a performance plan created by her managers who focused on costs and budget concerns. The scientists were concerned with completing research and development work, making deadlines and keeping internal and industry customers happy. Schibursky performed additional tasks for the scientists and others at IBM without regard to the number of hours or overtime the extra work might require.[1]

The relationship between Schibursky and her managers had been somewhat strained since late 1989. According to Schibursky, her managers often commented that she made lots of money and repeatedly suggested that she reduce her overtime hours. In late 1989 and early 1990, Schibursky's managers received several complaints about Schibursky from her peers. Schibursky's manager talked to her several times about working and communicating with others and the need to follow management direction and IBM policy. In September 1990, Schibursky received a performance appraisal from her manager. The scientists rated Schibursky a "1," the highest rating available. Schibursky's manager did not rate her so highly. She rated Schibursky a "3" for communication skills, resulting in an overall performance rating of "2" on a range of 1 through 4. Schibursky believed she deserved a "1" rating and appealed the appraisal through IBM's Open Door Policy.[2]

Pam Fossey ("Fossey") became Schibursky's direct manager in the fall of 1990. Fossey continued to receive criticism about Schibursky from her co-workers, but she only discussed the complaints with Schibursky on one occasion. Dick Lueck, the Director of Site Operation ("Lueck"), noticed Schibursky working on a weekend in September. Lueck asked Schibursky's managers to see if her time card reflected the weekend overtime. Fossey checked Schibursky's time card and discovered that it did not report the weekend overtime. The following weekend Fossey and another manager were

---

1. The RCD and CSL scientists are all exempt employees who need not worry about nor report overtime.

2. IBM's Open Door Policy permits any employee who has a problem with the actions of her immediate manager to appeal the complaint or concern to higher management.

working and noticed that Schibursky was also working. Fossey again checked Schibursky's time card and found that her weekend overtime was not recorded.[3]

In October 1990, Fossey gave Schibursky a new performance plan. Fossey remarked that Schibursky had excessive overtime hours and suggested she cut back on her overtime. The new plan did not include several duties which Schibursky had previously performed, such as handling personnel functions and scheduling travel itineraries. Fossey told Schibursky that she would have to eliminate many tasks she had performed in the past because they would no longer be paid for by Administrative Services. Schibursky did not voice any concerns to Fossey about the change in her duties. At the time, neither Schibursky or Fossey told the scientists about the change in Schibursky's duties. Schibursky continued to furnish the services that she had provided under her previous performance plans, but did not record any overtime associated with those additional services.

On October 10, 1990, Schibursky met with Lueck to contest her performance appraisal. Schibursky and Lueck discussed her duties and overtime in general. Lueck told Schibursky that she was providing too many services to RCD and CSL and said she should stick to her plan. Lueck upheld the appraisal and mentioned that Schibursky should record her overtime.[4] On October 17, 1990, Fossey held a department meeting which Schibursky attended. Fossey told the employees to apprise her beforehand of any weekend overtime. Fossey also stated that the employees needed to accurately record all overtime hours. Schibursky was present at the meeting but nothing was specifically directed at her.

In November 1990, Schibursky sent Lueck an electronic message while working on a Saturday. After realizing that Schibursky had been working weekend overtime, Lueck asked her managers to check her time card. Lueck was told that Schibursky had not received prior approval to work weekend overtime and that her overtime hours were not accurately recorded. Fossey met with Schibursky and voiced concern about her excessive overtime. Fossey said that everybody at IBM had to cut costs and told Schibursky that she needed to reduce the number of tasks she performed for RCD and CSL. Fossey gave Schibursky a direct order to curb her overtime hours and stated that if she did not cut back on her overtime something would have to be done about her job.

In December 1990, Schibursky's managers in Administrative Services decided to place her "on notice" for failing to meet a "condition of employment" because she was insubordinate for not accurately recording all her overtime as required by IBM policy and management direction. Fossey met with Schibursky on December 5, 1990. Fossey stated that she knew Schibursky had not been recording all her overtime and had worked weekends without prior approval. This meeting was the first time that a manager had spoken directly to Schibursky about working overtime and not recording it. Fossey gave Schibursky formal written notice that she had violated a condition of her employment with IBM.[5] Schibursky read and

---

3. The Fair Labor Standards Act ("FLSA") requires IBM to compensate all overtime hours worked by non-exempt employees. *See* 29 U.S.C. §§ 201 *et seq.* That legal obligation is mandatory. Schibursky cannot waive or modify IBM's obligation to compensate her for overtime by agreeing or desiring to work overtime without pay. An employer who fails to comply with the FLSA faces civil liability and penalties. *Id.* § 216.

4. On October 8, 1990, Fossey placed Schibursky "on notice" for failing to follow IBM's guidelines regarding business conduct when dealing with suppliers and vendors. Schibursky had contacted an airline directly when she became frustrated with the travel agency designated by the IBM

procurement department. Schibursky and Lueck discussed this notice but it was left in place. Although Schibursky felt that she had done nothing wrong, she did not contact a vendor directly again.

5. The notice stated, in part:

Gloria Schibursky—On Notice—Insubordination. This document places you on notice for the following reason: Insubordination (failure to follow management direction).
Specifically—you failed to let your manager know your weekend overtime requirements and you did not record your overtime worked on your timecard.

signed the notice. Fossey stated that further insubordination or failure to follow management direction could result in Schibursky's termination. According to Schibursky, Fossey also said that Schibursky only had to "record the overtime that was associated with meeting the requirements of the job as defined in [her] current performance plan." Deposition Transcript of Gloria Schibursky at 40.[6]

Schibursky felt that the condition of employment was unfair and appealed the notice. Lueck assigned an investigator to review the condition of employment. After an investigation, the notice for insubordination was affirmed on January 8, 1991, and Schibursky was told the notice would be left in place. The conditions of the notice were again reviewed with Schibursky. Schibursky met with Lueck on January 14, 1991, to discuss the investigation and its outcome. Lueck agreed with the notice and reminded Schibursky that she should measure to the plan and that a violation of the notice could result in her termination.

During the month of January 1991, Fossey and other managers observed Schibursky working overtime which she did not record.[7] Fossey confronted Schibursky on January 29, 1991, about failing to record all overtime as required by her condition of employment. After reviewing the information, Fossey terminated Schibursky the next day for insubordination. Through observation, monitoring

and by her own admission, Schibursky did not record all of her overtime after December 5, 1990. Schibursky claims, however, that the only overtime she did not record after December 5, 1990, was for items that IBM would not pay for or for personal matters. She insists that she followed Fossey's order and "recorded the overtime associated with [her] performance plan." Schibursky Dep. at 43. Schibursky, considering her dismissal unjustified, appealed her termination. Her complaint was investigated but was ultimately rejected. IBM concluded that Schibursky was fairly terminated because she was placed on notice, she was warned numerous times about recording her overtime, she continued to violate her condition of employment and she admitted to not recording all her overtime. On March 1, 1991, IBM informed Schibursky that her dismissal had been upheld.

In June 1991, Schibursky filed a claim with the Minnesota Department of Human Rights charging IBM with age discrimination. In January 1992, Schibursky filed suit in federal court claiming IBM discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act. 29 U.S.C. §§ 621–34 (1988) ("ADEA"). Schibursky also asserted state law claims for age discrimination, breach of contract, promissory estoppel, defamation, intentional and negligent infliction of emotional distress, tortious interference with business relationships and negligent supervision. The defendants have

Be advised that ANY form of insubordination (failure to follow management direction) could result in your dismissal from IBM.
The above is a condition of employment. Your problems in this area must be immediately corrected and sustained. Failure to comply with this condition will result in your dismissal from IBM.

6. The court notes that the testimony given by Schibursky on this point is inconsistent. At her deposition, Schibursky made the following statements:

Q: Did anyone at IBM tell you that if you were going to perform service for your department not on your performance plan it was okay for you to do that work for free?
A: No.
Q: What is it that caused you to believe that it was appropriate for you to do that?
A: I felt I had no choice. My performance would be affected if I didn't do my work.
Schibursky Dep. at 86–87.

It is unclear whether Schibursky claims that Fossey actually told her that she only had to record overtime related to her performance plan on December 5, 1990 or whether that was merely a subjective belief on the part of Schibursky. See Affidavit of Gloria Schibursky ¶ 14. ("The only way I could rationalize the situation was to assume that the portion of work my bosses assigned me to do but that my administrators told me would not be compensated by IBM, would not be considered overtime."). At this juncture, however, the court reads the facts in Schibursky's favor.

7. There is no indication, however, that Schibursky worked any weekends after the condition of employment was put in place on December 5, 1990.

moved for dismissal and, in the alternative, for summary judgment on all of Schiburský's claims.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires the trial court to direct a verdict if there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claims will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, a verdict should not be directed. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). When analyzing a motion to dismiss, the court looks to the complaint as pled. The complaint must be liberally construed and viewed in the light most favorable to the plaintiff. The court will dismiss a complaint only when it appears the plaintiff cannot prove any set of facts that supports the claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### 1. *Materials Considered by the Court*

The parties disagree about what materials the court may consider in ruling on the motion. There is no dispute that the transcript from Schiburský's deposition, the affidavits submitted by IBM and the affidavits of Schiburský and two retired IBM employees are properly before the court. IBM contends, however, that the court may not rely on a host of documents submitted by Schiburský because they do not comply with Fed. R.Civ.P. 56(c) and (e).[8]

■ The choice of materials to be considered in conjunction with a summary judgment motion is within the discretion of the court. The court agrees that Schiburský has failed to lay the foundation for the documents she submitted. Nonetheless, except as noted below, the court finds that circumstantial evidence supports the authenticity of the documents. The documents appear to be statements made by IBM's agents concerning a matter within the scope of employment and made during the relationship. Obviously, many of the documents were produced in the ordinary course of business and at least have a prima facie aura of reliability. Thus, the court finds that, except as noted below, the documents satisfy the evidentiary hurdles of authenticity and hearsay.

■ Several documents submitted by Schiburský contain handwritten notations. Often the source of the handwritten notations is not indicated and many of the notations

---

**8.** Schiburský submitted more than 30 documents to the court attached to the affidavit of her counsel which simply stated that "[i]ndexed and attached hereto as exhibits are true and correct copies of affidavits, documents, and newspaper articles which Plaintiff relies on in defending her cause of action in this motion."

are neither signed nor dated. In addition, the documents are not accompanied by an affidavit or any evidence that authenticates the notes appearing upon them. The court refuses to consider the handwritten notes on the grounds that the necessary evidentiary foundation has not been laid. The court finds that nothing in Exhibit I or Exhibit R indicates that the documents are what Schibursky purports.[9] Finally, some documents do not indicate whether they were in use during the time of the challenged actions between October 1988 and March 1991. Except when addressing Schibursky's claims for breach of contract and promissory estoppel, the court will not consider documents which fall outside the relevant time period.

### 2. Age Discrimination in Employment Act

 The ADEA does not require that every plaintiff in a protected age group be allowed a trial simply because she was discharged. To succeed on a charge of discrimination, the plaintiff must present proof of discriminatory intent. Discrimination, however, is difficult to prove by direct evidence. See, e.g., United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Accordingly, discriminatory motive on the part of the employer can be inferred in some circumstances.[10] While an ADEA claim may rely solely on indirect evidence, the plaintiff must adduce some competent evidence that shows age was a determining factor in her discharge.

Schibursky claims IBM discriminated against her based on her age. The United States Supreme Court recently clarified the standards for liability under the ADEA. Hazen Paper Co. v. Biggins, — U.S. —, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In Biggins, the Court held that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Id. at —, 113 S.Ct. at 1705. The plaintiff in Biggins was fired when he was 62 years old and a few weeks shy of his pension rights vesting. Id. The Court held that the decision to fire an employee solely because he had over 9 years of service and was "close to vesting" was not discriminatory treatment on the basis of age. Id.

The Supreme Court emphasized that what Congress sought to prohibit in the ADEA was discrimination of older employees based on the stereotype that "productivity and competence decline with old age." Id. The Court held that when the factor motivating dismissal of an older employee is merely correlated with age, however, the prohibited stereotype is not implicated. Id. at —, 113 S.Ct. at 1705–09.[11] The Court reasoned that "[b]ecause age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age-based.'" Id. at —, 113 S.Ct. at 1707. The Court concluded that dismissal based on a factor empirically correlated with age does not constitute discriminatory treatment on the basis of age under the ADEA. Id.

The court finds that the reasoning of Biggins is dispositive in this case. Schibursky

---

**9.** The court also disagrees with Schibursky's characterization of the documents contained in Exhibits D, G and Q.

**10.** The plaintiff is allowed to benefit from an inference of discrimination upon proof of four elements: (1) she is a member of the protected age group; (2) her job performance was satisfactory; (3) plaintiff was terminated; and (4) the employer assigned, at least temporarily, a younger person with no better credentials to do the same work. Haglof v. Northwest Rehabilitation, Inc., 910 F.2d 492, 493 (8th Cir.1990). See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the plaintiff proves her prima facie case, the employ-

er must come forward with a legitimate, nondiscriminatory reason for the dismissal. If the employer does so, the plaintiff must set forth specific facts which show that the employer's stated reason is merely a pretext for intentional discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

**11.** See Biggins, — U.S. at —, 113 S:Ct. at 1706 (holding that "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is.") (emphasis in original).

alleges that she was one of the highest paid people in her position at a time when IBM was experiencing economic pressures. Schibursky claims that she was fired because she cost too much due to her years of service with IBM. IBM fired Schibursky when she was 47 years old and had worked for IBM for 22 years. At the time, Schibursky was earning an annual salary of nearly $50,000. Her replacement, Maureen A. Gwynn ("Gwynn"), was 42 years old when she took over Schibursky's secretarial duties.[12] Schibursky claims that Gwynn had less seniority with IBM and, therefore, was paid much less. Schibursky stated that her "age case was based on my cost to the company" and the fact that her discharge saved IBM money in some way. Schibursky Dep. at 137–38. Schibursky believes that the comments made by her managers about her overtime and how much money she made were attributable to her age because "when you're older with the company, you make more money." *Id.* at 140.

■ Schibursky's disparate treatment claim cannot succeed unless her age actually played a determinative role in her termination. It is clear from Schibursky's own testimony that her claim of age discrimination is based on IBM's alleged decision to terminate her based on her years of service with IBM. Schibursky's claim of age discrimination presumes that a decision based on years of service is necessarily age-based. The firing of an employee to save salary costs resulting from seniority, however, does not violate the ADEA. Even if older employees of IBM are more likely to have more years of service than younger employees, IBM's alleged decision to fire Schibursky because of her years of service is not discriminatory treatment on the basis of age. *See Biggins,* —— U.S. at ——, 113 S.Ct. at 1705–07.

■ IBM claims that Schibursky was terminated for insubordination because she did not record all of her overtime as required by IBM policy, the December 5, 1990, notice of condition of employment and as directed by her manager. Schibursky insists that IBM's reason for her termination has no basis in fact and, therefore, is merely a coverup for age discrimination.[13] The court finds that the evidence, as construed most favorably to Schibursky, at most tends to show that IBM's reason was a pretext for dismissing her based on her years of service or due to friction between Schibursky and her managers. The Supreme Court made clear in *Biggins* that the ADEA does not protect Schibursky from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated on the basis of her age.[14] There is no evidence that age actually motivated IBM's decision to terminate Schibursky or that IBM's proffered reason is a pretext for age discrimination.[15]

In support of her age discrimination claim, Schibursky argues that older workers with high salaries at IBM were being harassed into retiring or were discharged and replaced with "less senior individuals with lower pay." Schibursky Aff. ¶ 8. Schibursky has failed to

**12.** Schibursky makes the unfounded assertion that Gwynn is not Schibursky's "true replacement." For purposes of this motion, the court finds that IBM replaced Schibursky with Gwynn.

**13.** The court notes that Schibursky's subjective disbelief that she could be fired for failing to report "a few hours of overtime" is irrelevant to whether she was the victim of age discrimination.

**14.** Despite Schibursky's subjective belief to the contrary, the statements made by Schibursky's managers about her overtime do not indicate that she was discriminated on the basis of age. Schibursky herself stated that keeping overtime hours down had recently become a priority at IBM. There is no indication that Schibursky was singled out in this respect based on her age.

Schibursky contends that the fact that Fossey met privately with another senior secretary in late 1990 and warned her to be careful to write down all overtime, but did not put her on notice, shows that IBM discriminated against Schibursky. *See* Affidavit of Marlyce Koskovich ¶ 8. The court notes that the other senior secretary was also within the protected age group. The court finds that this evidence in no way indicates age discrimination.

**15.** *See Biggins,* —— U.S. at ——, 113 S.Ct. at 1707–09 ("inferring age-motivation from the implausibility of the employer's explanation may be problematic in cases where other unsavory motives, such as pension interference, were present.").

come forward with any evidence that tends to show IBM treated employees with more seniority, much less older employees, disparately. Schibursky provided the court with an affidavit of a retired IBM employee which contains nothing other than speculation and, accordingly, is not competent evidence. *See Koskovich Aff.* ¶ 11 ("During my last year at IBM, it appeared to me that the people in Administrative Services were looking for excuses to get rid of older, more senior people who had relatively high pay. The Administrative Services people were making things tough for older, more senior employees."). In any event, the gist of Schibursky's complaint once again focuses on IBM's alleged disparate treatment of employees based on their seniority, not based on their age. The court finds that Schibursky has failed to set forth any specific facts which would permit a jury to find that IBM treated older employees differently based on age.

██ There is no direct evidence of age discrimination in this case. Moreover, besides relying on the years of service evidence, Schibursky has failed to offer any other evidentiary support for ADEA liability. Schibursky stated that she felt IBM has been discriminating against her on the basis of her age since late 1988. The first incident cited was Schibursky's transfer to the RCD and CSL division because she was "unaffordable" in her previous position. Schibursky feels that she was told to quit performing services beyond her performance plan because it would cut down on her overtime, which, due to her age, cost more than less senior employees. Schibursky also believes that she received smaller salary increases in recent years and that IBM offered her fewer and less attractive positions due to her age. Between late 1988 and January 1991, IBM offered Schibursky several promotions and transfers but she turned them all down. Schibursky also feels that because of her age, IBM never promoted her to the position of executive secretary. Schibursky has offered no evidence to substantiate her claims. Her subjective beliefs and bare allegations fall well short of showing age was a determining factor in her discharge. The court finds that Schibursky has failed to set forth any facts which establish a connection between these events and her claim of age discrimination.

██ The court recognizes that to withstand summary judgment Schibursky is required only to show that her discharge occurred under circumstances which permit an inference of unlawful discrimination. The court finds, however, that Schibursky has failed to make such a showing. The ADEA does not create automatic presumptions against an employer whenever an older worker is replaced with a younger one. The ultimate inquiry in any age discrimination suit is whether the plaintiff has offered enough evidence for a jury to find that age discrimination played a determining factor in her discharge. The court concludes that, as a matter of law, Schibursky has failed to set forth sufficient evidence from which a jury could infer that age discrimination was a determining factor in her discharge. Accordingly, the court grants IBM's motion for summary judgment on Schibursky's claim of age discrimination in violation of the ADEA.

### 3. *Minnesota Human Rights Act*

Schibursky also claims she was discharged because of her age in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03 (1986) ("MHRA"). In considering discrimination claims under the MHRA, Minnesota courts have adopted the standard established by the federal courts in applying federal discrimination statutes. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 442 (Minn. 1983). Having concluded that Schibursky's ADEA claim fails to survive summary judgment, the court grants IBM's motion for summary judgment on Schibursky's claim of age discrimination in violation of the MHRA.

### 4. *Breach of Contract*

██ Schibursky insists that material issues of fact exist regarding her breach of contract claim. Employment relationships in Minnesota are generally presumed to be at-will. *See Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983). This means the employer may summarily dismiss the employee at any time for any reason or no reason. *Id.* To overcome the presumption of at-will employment, Schibursky must

present evidence IBM made oral or written statements with specific and definite provisions, not general statements of policy. *Holman v. CPT Corp.*, 457 N.W.2d 740, 743 (Minn.Ct.App.1990). *See Pine River*, 333 N.W.2d at 626 ("The offer must be definite in form and must be communicated to the offeree.... An employer's general statements of policy are no more than that" and do not suffice). General statements about job security are insufficient to overcome a grant of summary judgment to an employer. *See Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 771–72 (Minn.Ct.App.1987).

Schibursky does not dispute that, at least initially, she was an at-will employee. Nor does Schibursky contend that IBM made any promises or formal written contract respecting the duration of her employment. She claims, however, that IBM made certain statements which constituted offers sufficient to modify the at-will nature of the employment relationship. Schibursky claims that IBM communicated to her "it would not discharge her without first having placed her 'on condition,' and that it would not place her 'on condition' without first having given her at least a certain number of 'warnings'" and also that "it would not discharge her except for cause." Complaint at ¶ 10 & 13.

■ In her affidavit, Schibursky stated that "IBM did not follow its own procedure, which it had communicated to me, of giving, first, oral, and later, written warnings." Schibursky Aff. ¶ 11. She also stated that "[d]uring my employment, IBM communicated to me that it would not fire me without good cause.... I know that IBM never fires an employee without good cause because of my involvement in high level ... management meetings." *Id.* at ¶ 12. In addition, two retired IBM employees confirmed that (1) IBM would not terminate an employee without good cause, and (2) except for very serious violations such as sexual harassment or theft, IBM would not place an employee on condition of employment unless the person had first received a written warning in a face-to-face meeting. *See* Affidavit of Ann Tompkins ¶ 5; Koskovich Aff. ¶ 5.

The court is troubled by the fact that Schibursky fails to identify when or where the statements were "communicated" to her and by whom at IBM. On a motion for summary judgment, however, the court must give credibility to the factual allegations in her affidavit. The court finds that IBM's alleged statements about good cause and a pretermination warning procedure are sufficiently definite to modify an at-will contract. The court concludes that Schibursky raises a genuine issue of material fact as to whether she had an oral contract not to be discharged without compliance with the warning procedure she described and whether she had an oral contract that she be terminated only for good cause.

■ IBM contends that, even if a contract existed, Schibursky has not shown it was breached because IBM fired her for good cause, namely insubordination, after numerous warnings and adequate time to make corrections. The evidence indicates that Fossey neither discussed the recording of overtime directly with Schibursky or gave her a formal written warning before putting her on notice. In addition, Schibursky has testified that she recorded all overtime associated with her assigned duties as described in her Performance Plan and as instructed by Fossey when she was placed on notice.[16] Based on the evidence provided, a reasonable jury could conclude that IBM failed to give Schibursky the requisite warnings before placing her on notice for insubordination and that it erroneously terminated her without good cause. Accordingly, the court holds that Schibursky's claim that IBM breached an oral contract that afforded her certain pretermination warnings and a right not to be terminated except for good cause survives summary judgment.

The court concludes, however, that Schibursky's other allegations concerning oral promises and offers are too general to support an employment contract. Even if the language were sufficiently definite to form a contract, the court finds that there is no evidence to suggest that IBM breached it.

---

**16.** As the court noted earlier, Schibursky's testimony on this point is inherently inconsistent.

However, the court must leave the weight of the evidence and issues of credibility to the jury.

The court also rejects Schibursky's contention that the doctrine of condonation applies here. *See Bautch v. Red Owl Stores, Inc.,* 278 N.W.2d 328 (Minn.1979) ("an employer's condonation of an employee's wrongful conduct is a mitigating factor which may cause the employer to waive its right to discharge the employee on the basis of such misconduct."). There is absolutely no evidence that IBM was aware that Schibursky or other employees did not record overtime and acquiesced in such behavior.

The court recognizes that an at-will employment relationship may be modified by an employment handbook where the language is sufficiently definite and specific to constitute an offer, the offer is disseminated to the employee, and the employee continues to work, thereby accepting the offer and providing consideration. *See Pine River,* 333 N.W.2d at 626–27. Schibursky relies on a host of documents to establish alleged contractual rights. The court finds that the evidence presents a jury question as to whether the documents relied on by Schibursky were distributed to her. The court concludes, however, that nothing in the documents submitted by Schibursky establishes the contractual rights she alleges.

■■■ The documents submitted by Schibursky identify insubordination as a condition of employment which may lead to an employee's dismissal. *See* Brief for Plaintiff, Exhibit A (Conditions of Employment). The documents clearly state that, after being put on notice, an employee may be dismissed from IBM for violating a condition of employment. *Id.* Besides notice of a condition of employment, the documents contain very little about progressive discipline or warnings prior to termination. A letter distributed to managers in 1984, and apparently again in 1991, states that when dealing with unsatisfactory performance, the manager should "[i]dentify the deficiency, have a counseling session, and work out a specific plan to improve performance." *See id.* (Performance Management 1991). The same letter states

that when counseling and corrective action fail to produce improvement, the manager may have to separate the employee from the company. *Id.* The letter makes no promises about what procedure will be adhered to; rather, it uses vague terms and expresses general statements of policy.

The other documents submitted by Schibursky merely reflect IBM's general policy of respect for the individual. *See id.* (Basic Conduct Guidelines) ("IBM's basic belief of respect for the individual has led to a strict regard for the privacy and dignity of each employee."). Some documents also express concern for the employees' well-being. *See id.* (Performance Planning, Counseling, and Evaluation Program) ("The IBM Performance Planning, Counseling and Evaluation program is part of the merit concept and is designed to assure that employees are treated as individuals during their careers at IBM."); (IBM Manager's Manual) ("The *Open Door Policy* is a further reflection of our belief in the dignity of the individual and the right to appeal the actions of those for whom one works."); (Termination of IBM Employment) ("It is IBM's intention to terminate the employment relationship with separating employees in a manner that is prompt, thorough and courteous."). Based on IBM's avowed commitment to the individual, Schibursky inferred that IBM would provide job security and treat her in a humane manner. A party's subjective impressions and beliefs, however, are not relevant to ascertaining contractual terms.

The resolution of whether language rises to the level of a contract is for the court. The court finds that the statements in the documents are not sufficiently specific and definite to constitute a valid offer of an employment contract. Accordingly, the court grants IBM's motion for summary judgment on Schibursky's claim for breach of contract based on various assurances contained in IBM's employee manual or other written materials.[17]

---

17. What facts Schibursky might develop later are not relevant to the motion before the court. Schibursky may not avoid summary judgment merely by claiming that she will "bring forward evidence of many employment manuals and the

like" and "produce volumes of personnel policies ... which support a finding of both an employment contract and promissory estoppel" or that she will testify about "oral and other representa-

### 5. *Promissory Estoppel*

██ To state a cause of action based on the doctrine of promissory estoppel, Schibursky must show: (1) IBM made a promise; (2) IBM expected or should have reasonably expected the promise to induce substantial and definite action by Schibursky; (3) the promise did induce such action; and (4) the promise must be enforced to avoid injustice. *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114 (Minn.1981); *Corum v. Farm Credit Servs.*, 628 F.Supp. 707, 715 (D.Minn. 1986).

██ Schibursky has not made a prima facie showing of detrimental reliance. Reliance must be more than mere speculation; an actual change in the employee's position is required. *See Dumas v. Kessler & MaGuire Funeral Home, Inc.*, 380 N.W.2d 544, 548 (Minn.Ct.App.1986) (employee's continued employment with an employer not sufficient reliance to support promissory estoppel claim). Thus, the court holds that summary judgment on this claim is appropriate.

### 6. *Defamation*

██ Under Minnesota law, a plaintiff suing for defamation must plead and prove the defendant published a false statement of fact that concerns the plaintiff and tends to harm the plaintiff's reputation or to lower her in the estimation of the community. *Stuempges v. Parke–Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980) (citing *Restatement (Second) of Torts* §§ 558–59 (1977)).

Schibursky claims that IBM concocted false information to justify her termination. Specifically, Schibursky denies that her co-workers complained about her and asserts that the individually named defendants made false complaints against her. In the complaint, Schibursky alleges that:

> To justify Plaintiff's termination, Defendants, and Defendant IBM, through its duly authorized agents and employees, falsely and maliciously alleged improper conduct on behalf of Plaintiff to other employees and co-workers, and otherwise made false statements concerning Plaintiff and her work, including but not limited to,

the allegations that Plaintiff was hard to work with, rude, insubordinate, and did not follow company procedures.

Complaint ¶ 41. IBM contends that Schibursky's defamation claim should be dismissed for lack of specificity because it alleges nothing more than that "unspecified defendants made unspecified statements concerning plaintiff to unspecified third parties at unspecified times." Brief for Defendants at 15. Schibursky insists that her description of the allegedly defamatory statements is sufficient because it fairly apprises the defendants of the charges they are facing.

██ The court is cognizant of the generous standard governing dismissal of a claim. Nonetheless, a claim for defamation must be pled with a certain degree of specificity. *Pinto v. Internationale Set, Inc.*, 650 F.Supp. 306, 309 (D.Minn.1986); *Stock v. Heiner*, 696 F.Supp. 1253, 1260 (D.Minn. 1988). The fact that Schibursky failed to recite the exact language spoken is not fatal to her defamation claim. *Stock*, 696 F.Supp. at 1260. At the very least, however, Schibursky must identify which defendants made false and defamatory statements. *Corum*, 628 F.Supp. at 716. This Schibursky has not done. Schibursky "failed to allege who made the allegedly libelous statements, to whom they were made, and where." *Pinto*, 650 F.Supp. at 309. The complaint does not notify any of the individual defendants of what defamatory remarks he or she allegedly made. Accordingly, the court concludes that Schibursky's complaint fails to set forth a cognizable claim for defamation.

██ Moreover, some of the general defamatory remarks alleged in the complaint would not be actionable even if they were pled with specificity. Whether a statement implies objective facts that may be defamatory is a question of law for the court to decide. *Lund v. Chicago & Northwestern Transp. Co.*, 467 N.W.2d 366, 369 (Minn.Ct.App.1991). To be actionable, a defamatory statement must be specific and verifiable by reference to fact. *Id.* Even assuming that the defendants communicated to others that Schibursky was "hard to work with" or "rude," the

tions that can reasonably be found to be a con-

tract." *See* Brief for Plaintiff at 18–19.

statements relate to her personal traits and, as a matter of law, are too imprecise to be actionable. *See Lund,* 467 N.W.2d at 369 (memorandum posted in workplace which used terms "move ups," "shit heads," "brown nose" and "favoritism" not actionable although uncomplimentary); *Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 821 (Minn.Ct.App.1988) (office gossip among co-workers describing plaintiff as "bitch," "fluffy" and flirtatious not actionable). The court holds that, as a matter of law, the alleged statements that Schibursky is "hard to work with" and "rude" are not actionable.

Looking beyond the complaint, the court finds that Schibursky has failed to provide any evidence to support her claim of defamation. Schibursky claims that:

> "my managers from Administrative Services and some people in Personnel, began to create, solicit and circulate false rumors about me. These people encouraged my co-workers to come forward with false stories concerning my work, false statements regarding my ability to get along with others, and false stories that I had been insubordinate with both co-workers and superiors.

Schibursky Aff. ¶ 17. Schibursky cannot avoid summary judgment by resting on mere assertions, whether contained in the complaint or her affidavit.

▆▆▆ Schibursky relies heavily on an electronic mail letter dated April 4, 1989 and written by Masaaki Hirosue ("Hirosue") of IBM's Yamato, Japan Laboratory. *See* Brief for Plaintiff, Exhibit G at 3. In that letter, Hirosue praises the secretarial work Schibursky did for him while he was· at IBM in Rochester, Minnesota. Hirosue also states that:

> I heard a criticism on [Schibursky] from her peers while I was [in Rochester]. In the past, administrative manager came to see me asking for my observation about [Schibursky's] behavior, which always look for areas of improvement and sometimes very much in synch with peers criticism. So I nodded. But now I look back her work and support provided, these are very professional and efficient and effective.

> Sometimes her devotion to the work or to the boss or her persuasiveness might invite personal criticism from her peers. But those are very minor in comparison with her professional/effective support to me.

Schibursky insists that Hirosue's letter unequivocally shows that her managers defamed her by seeking false rumors about her. The court finds, however, that Hirosue's letter confirms that her peers complained about her. The letter makes clear that her managers asked if Hirosue agreed or disagreed with the criticism registered by Schibursky's co-workers. Hirosue's letter in no way indicates that Schibursky's managers solicited false information about her. ·

Other than Hirosue's letter, Schibursky provides no other evidence of any statements made by her managers to individuals either inside or outside the company. Schibursky has failed to present any facts to support a claim that the defendants directly defamed her. Schibursky's assertion· that facts supporting her claim will be developed later or at trial is not enough to defeat summary judgment. In sum, Schibursky suspects and speculates that the defendants made defamatory statements about her, but mere suspicion and conjectural assertions are not enough to withstand a motion for summary judgment. *See Roberts v. Browning,* 610 F.2d 528, 532 (8th Cir.1979); *Corum,* 628 F.Supp. at 717. Accordingly, the court grants the defendants' motion to dismiss Schibursky's claim for defamation and denies Schibursky's request to amend her defamation claim.

### 7. *Emotional Distress*

Schibursky claims that after she used IBM's Open Door Policy to appeal her performance appraisal, the defendants undertook a prolonged course of extreme and outrageous conduct intended to cause her severe emotional and mental distress. Specifically, Schibursky claims that the defendants intentionally and negligently inflicted emotional distress by subjecting her to unwarranted and oppressive surveillance, by tracking her

comings and goings [18] and by verbally abusing her about receiving a good salary. Schibursky also asserts that the defendants inflicted emotional distress by intentionally revealing to Schibursky that she had been monitored and by concocting a justification to terminate her.

■ To succeed on her claim for intentional infliction of emotional distress, Schibursky must show the defendants, by extreme and outrageous conduct, intentionally or recklessly caused her to suffer severe emotional distress. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn.1983). The Minnesota Supreme Court has emphasized that the conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* at 439 (quotation omitted). Finally, the resulting stress must be "so severe that no reasonable [person] could be expected to endure it." *Id.* (quoting *Restatement (Second) of Torts* § 46 comment j (1965)).

■ The defendants contend that the conduct alleged by Schibursky in this case falls well short of the egregious conduct required. Obviously, simply because Schibursky feels she was harassed does not make the defendants' conduct actionable. "It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Price v. Viking Press, Inc.*, 625 F.Supp. 641, 650 (D.Minn.1985), *aff'd*, 881 F.2d 1426 (8th Cir. 1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990).

Taking the conduct at its worst, IBM engaged in extensive workplace surveillance of Schibursky to determine her whereabouts. Schibursky's managers, co-workers and, on one occasion, a security guard were all used to track her presence in the building. Her managers then compared their observations with the hours reported on her time card. Lueck also directed that Schibursky be monitored through her computer terminal and twice ordered the controlled access system be used to determine whether Schibursky was working weekend overtime during the fall of 1990. It is not disputed that the use of the controlled access system, the computer terminal and the security guard to gauge Schibursky's comings and goings violated IBM policy. Before it terminated Schibursky, IBM revealed to her that she had been monitored, although she had detected the surveillance earlier. Besides the surveillance, Schibursky's managers often remarked that she received a good salary.

Schibursky contends that the "[f]ull-scale surveillance by IBM, combined with the criticism she endured, is not the sort of distress people ordinarily suffer and endure." Brief for Plaintiff at 29. The court disagrees. For the most part, the defendants' actions focused upon whether Schibursky was working overtime she did not record. IBM did not spy on Schibursky's private life or any other matters unrelated to her job at IBM. Employers routinely engage in a variety of practices in order to confirm the accuracy of employee records, including time cards. The workplace surveillance, even though regarded by Schibursky as oppressive, simply does not constitute "conduct utterly intolerable in a civilized society." *See Hubbard*, 330 N.W.2d at 440. Nor does IBM's disclosure of the surveillance to Schibursky, even if intentional and intended to harass, rise to the level of egregious conduct required. *See Cafferty v. Garcia's of Scottsdale, Inc.*, 375 N.W.2d 850, 855 (Minn.Ct.App.1985) (unexpected information or notification of termination, "[w]hile not a compassionate or humane practice," not egregious conduct). The court also finds that the verbal abuse of Schibursky by her managers falls short of the egregious conduct required. *See Lund*, 467 N.W.2d at 370 (employee failed to state claim where his manager posted criticism of the employee and, after the posting, co-workers verbally harassed employee and twice put pepper in his coffee). Finally, there is absolutely no evidence that the purpose behind IBM's surveillance was, as Schibursky

---

18. The defendants used Schibursky's managers, co-workers and, on one occasion, a security guard to track her presence in the building. Schibursky was also monitored through the controlled access system and her computer terminal.

claims, to find a justification for terminating her and ruining her livelihood.

■ The court also has an obligation to determine whether the evidence offered to prove severe distress is sufficient to allow the claim to go to the jury. *Hubbard,* 330 N.W.2d at 440 & n. 9. The primary evidence of Schibursky's emotional distress is her own testimony that she suffered severe distress "as a result of" defendants' conduct. Schibursky stated that her "last four months at IBM were unbearable" and that she "was unable to sleep during this time." Schibursky Aff. ¶ 19. Schibursky said that she "always felt like someone was watching" her, "ready to pounce" on her if she made a mistake. *Id.* Schibursky claimed she could barely work "because of the pressure" and that the stress caused her skin to break out all over her body. *Id.* Schibursky also claims that the defendants' conduct damaged her family life and the quality of her life outside of work. *Id.* Schibursky stated that after she was fired by IBM:

> I thought I would go crazy. I paced the floors 24 hours a day and lost six pounds in the first week. For the next four months, I [was] depressed and could barely function.

Schibursky Aff. ¶ 20. Schibursky did not submit any medical evidence of her injuries.

The court finds that the extent of the "injury" proven by Schibursky does not exceed that of any employee who is criticized by an employer or suffers a termination which the employee feels is unjust. *See Hubbard,* 330 N.W.2d at 440 (court held emotional injury not sufficiently severe where only evidence of distress was employee's testimony that he was depressed, became physically ill in terms of throwing up and stomach disorders and developed a skin rash and high blood pressure). The court concludes that, as a matter of law, the emotional distress shown in this case is not "so severe that no reasonable person could be expected to endure it." *Id.* at 439 (quotation omitted).

The court concludes that the lack of evidence of extreme and outrageous conduct and of the actual occurrence of severe emotional distress are fatal to Schibursky's claim of intentional infliction of emotional distress. Accordingly, the court holds that summary judgment on this claim is appropriate.

Schibursky's claim for negligent infliction of emotional distress is dependent on her showing a direct invasion of rights, such as defamation, malicious prosecution, or other willful, wanton, or malicious conduct. *Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 823 (Minn.Ct.App.1988). Consequently, Schibursky's cause of action cannot survive dismissal of the defamation claim unless she can meet the "zone of danger" test. *Id.*[19] To satisfy that standard, Schibursky must show that the defendants placed her within a zone of danger of physical impact, prompting reasonable safety concerns and causing severe emotional distress and resultant physical injury. *Id.* No material facts exist which would show that Schibursky was in a "zone of danger" or feared for her safety. The court concludes that under the facts of this case, Schibursky's claim for negligent infliction of emotional distress fails.

### 8. *Tortious Interference with Business Relationships*

■■ To succeed on her claim for tortious interference with a business relationship, Schibursky must show: (1) the existence of a contract; (2) the defendants' knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. *Bouten v. Richard Miller Homes,* 321 N.W.2d 895, 900 (Minn.1982) (citation omitted). In Count 7 of the complaint, Schibursky alleges:

> Defendant IBM, through its duly authorized agents and employees, intentionally and wrongfully deprived Plaintiff of her employment in order that Defendant might benefit from the savings it could realize from replacing Plaintiff with a lower paid employee.

19. The court need not address Schibursky's contention that her claims for age discrimination, negligent supervision and tortious interference with a business relationship provide a basis for her claim for negligent infliction of emotional distress claim because it holds in favor of the defendants on all those claims.

Complaint ¶ 47. IBM cannot be liable in tort for interfering with a contract between itself and Schibursky. *Id.* at 901 (citing W. Prosser, *The Law of Torts* § 129 (4th ed. 1971)). Schibursky's only cause of action against IBM, as a party to the employment contract, is for breach of contract. Accordingly, the court grants IBM's motion to dismiss Count 7 of the complaint.

██ Despite the plain meaning of the allegations contained in Count 7, Schibursky insists that her tortious interference with a business relationship claim has been misunderstood. Schibursky denies that Count 7 seeks to impose liability on IBM for breaching its relationship with her. Instead, Schibursky now asserts that Count 7 claims that the individually named defendants intentionally sabotaged her employment at IBM.[20] The court finds that, even when construed liberally and viewed in Schibursky's favor, Count 7 as pled does not support her newly asserted contentions. The court rejects Schibursky's attempt to transform Count 7 into a cause of action against the individual defendants.[21]

Even if the court were to consider the merits of Schibursky's claim that she was the victim of a campaign conducted by her managers to terminate her employment at IBM, it would conclude there is absolutely no evidence which supports the new allegations. Schibursky has not offered any specific facts that tend to show the individual defendants intentionally and improperly interfered with her relationship with IBM. Instead, Schibursky merely assures the court that facts supporting her claim will be developed later or at trial. Here, as with the defamation claim, Schibursky cannot successfully defend a summary judgment motion based on allegation and conjecture.

### 9. *Negligent Supervision* [22]

Schibursky claims that IBM breached its duty to supervise the employees involved with her complaints, performance evaluations and termination. Schibursky alleges that "IBM had a responsibility to properly supervise its employees, including those who were involved with Plaintiff's open door complaints, performance evaluations, and termination, but failed to do so." Complaint ¶ 49. Schibursky claims that "IBM should surely be held liable for negligent supervision" because Lueck twice used the controlled access system to determine whether Schibursky was working weekend overtime during the fall of 1990. She further claims that IBM may be held liable in tort for the alleged smear campaign waged against Schibursky by the individually named defendants.

Minnesota has generally adopted § 213 of the *Restatement (Second) of Agency,* which provides for a negligent supervision cause of action.[23] *See Ponticas v. K.M.S. Invs.,* 331

---

**20.** Specifically, Schibursky "claims that each individually named defendant interfered with Plaintiff's relationship with IBM by defaming her, improperly seeking and spreading rumors about her ... and otherwise destroying Plaintiff's employment relationship with IBM." Brief for Plaintiff at 30.

**21.** Schibursky's attempt to add a claim for tortious interference with prospective contractual relations via her brief is also unavailing. Schibursky claims in her brief that "all Defendants interfered with Plaintiff's business relationships with potential employers as evidenced by the fact that Plaintiff had to seek work for over six months before she found any and the only position available then carried a salary of just over $15,000, despite the fact that she had over 20 years of secretarial experience." Brief for Plaintiff at 30. Schibursky seems to have confused interference with a contract with interference with prospective contractual relations. A claim for interference with prospective relations, how-

ever, is a distinct cause of action. *See Hunt v. Univ. of Minnesota,* 465 N.W.2d 88, 95 (Minn. App.1991). Schibursky cannot assert additional causes of action against the defendants simply by making new allegations in her brief. Even if the court were to consider the merits of such a claim, it would conclude there is absolutely no evidence which supports the new allegations. While Schibursky speculates that the defendants must have interfered with her prospective employment relations because she had difficulty securing another job, such speculation is insufficient to support a claim of tortious interference.

**22.** Although Count 8 is entitled "Negligent Supervision and Retention," the court notes that only the tort of negligent supervision was actually pled.

**23.** Section 213(c) provides that "a person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless * * * in the supervision of the activity." *Restatement (Second) of Agency* § 213(c) (1958).

N.W.2d 907, 911 (Minn.1983) (involving negligent hiring). IBM contends that tort claims based on negligent supervision arise only where the employee's conduct causes physical injury to a third person. *See* Brief for Defendants at 21. The court notes that while Minnesota recognizes the cause of action, its courts have not yet defined the parameters of the duty or the type of claims arising out of the negligent supervision of an employee. The court finds, however, that it need not resolve those questions in this case.

 Assuming without deciding that Schibursky states a cause of action for negligent supervision, the court finds that there is no genuine issue of material fact that IBM breached the duty. There is no evidence that the individual defendants conducted a smear campaign against Schibursky. Although Lueck violated IBM policy by using the controlled access system, the computer system and a security guard to monitor Schibursky's whereabouts, the evidence also indicates that, once aware of the violations, IBM took timely corrective measures. *See* Brief for Plaintiff, Exhibit H (Memorandum from R.J. Labant to J.F. Akers dated March 1, 1991). To hold IBM directly liable in tort, Schibursky must show that IBM was negligent. Schibursky has failed to present any facts to support a claim that IBM was negligent in the supervision of its employees. Accordingly, the court grants IBM's motion for summary judgment on Schibursky's claim for negligent supervision.

## CONCLUSION

The court concludes that summary judgment is appropriate on Schibursky's claims for violation of the ADEA, violation of the MHRA, promissory estoppel, intentional and negligent infliction of emotional distress and negligent supervision. In addition, except for Schibursky's claim that IBM breached an oral contract that afforded her a certain pre-termination warning procedure and a right not to be terminated except for good cause, the court holds that summary judgment is also appropriate on Schibursky's claim for breach of an employment contract. The court dismisses Schibursky's claims for tortious interference with business relationships

and defamation and denies Schibursky's request to amend her claim for defamation.

Based on the foregoing, IT IS HEREBY ORDERED that pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure:

1. The motion of IBM for summary judgment on Schibursky's claim for age discrimination in violation of the ADEA is GRANTED;

2. The motion of IBM for summary judgment on Schibursky's claim for age discrimination in violation of the MHRA is GRANTED;

3. The motion of IBM for summary judgment on Schibursky's claim for breach of contract is GRANTED in part and DENIED in part;

4. The motion of IBM for summary judgment on Schibursky's claim for promissory estoppel is GRANTED;

5. The motion of defendants to dismiss Schibursky's claim for defamation is GRANTED;

6. The motion of defendants for summary judgment on Schibursky's claim for intentional infliction of emotional distress is GRANTED;

7. The motion of defendants for summary judgment on Schibursky's claim for negligent infliction of emotional distress is GRANTED;

8. The motion of IBM to dismiss Schibursky's claim for tortious interference with business relationships is GRANTED;

9. The motion of IBM for summary judgment on Schibursky's claim for negligent supervision is GRANTED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**