Janet K. LEE, Appellant,

v.

**METROPOLITAN AIRPORT COMMIS-
SION, et al., and Kathy Foley, et
al., Respondents,**

**John Doe and/or Jane Does not yet
identified, Defendants.**

No. C8–88–538.

Court of Appeals of Minnesota.

Aug. 30, 1988.

Brad C. Eggen, Minneapolis, for appellant.

Donald W. Selzer, Jr., Jacqueline A. Shubatt, Oppenheimer, Wolff & Donnelly, St. Paul, for MAC and Anderson.

Clifford M. Greene, Julie A. Sweitzer, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for Foley and Johannes.

Heard, considered and decided by NORTON, P.J., and HUSPENI and KALITOWSKI, JJ.

## OPINION

NORTON, Judge.

Appellant Janet Lee appeals from the summary judgment granted in favor of all respondents on all counts. Appellant's complaint alleged defamation, breach of contract, negligent and intentional interference with contractual rights, negligent and intentional infliction of emotional distress, and illegal solicitation of a polygraph test. We affirm.

## FACTS

Janet Lee had been a dispatcher for nine years when she was hired by the Metropolitan Airport Commission (MAC), in October 1984. Respondents Kathy Foley and Eunice Johannes are also dispatchers with the MAC. Respondent Timothy Anderson is appellant's supervisor at the MAC. The dispatchers handle communications and coordinate emergency assistance among airport police, fire, maintenance, and other departments.

Prior to working for the MAC, appellant had been a dispatcher for the St. Louis Park Police. Lee took the job with the MAC, because she was informed that there were promotional opportunities with the MAC and that she had a good chance of advancing rapidly. However, when she was hired in October 1984, she was never promised by anyone at the MAC that she would get the job of supervisor. Many of the other dispatchers heard rumors shortly after Lee was hired that she would be taking over as supervisor.

In late 1984 or early 1985, the dispatchers were informed of an opening for the lead dispatcher position. Respondents Foley and Johannes and appellant applied for this job as did two other MAC dispatchers.

In late May 1985, respondent Tim Anderson informed Lee that she would be recommended for the lead dispatcher position, subject to approval by the executive director of the airport and authorization of the position by the MAC. Anderson did not state what the wage for the new position would be, nor give the exact job description. Lee was to begin as acting lead dispatcher immediately, until she was formally appointed to the permanent senior dispatcher position. On June 3, 1985, Anderson sent a memo to other dispatchers informing them of his decision to recommend Janet Lee for the new lead dispatcher position.

Late in the morning of June 4, 1985, Johannes was on duty with another dispatcher when she answered a phone call. A singsong female voice said, "I know something you don't know—ha, ha, ha, ha." The call was automatically recorded on the dispatch center recording equipment and was subsequently rerecorded by the dispatchers. The dispatchers immediately thought that the voice sounded like Janet Lee's.

On June 5, Lee worked her final shift before starting an out of town vacation. On June 6th, Anderson conducted the regularly scheduled monthly dispatchers meeting. A major concern at the meeting was Anderson's decision to recommend Lee for lead dispatcher. After Anderson had explained some of the reasons for the decision, one of the dispatchers asked Anderson to listen to the tape. He was not informed of whose voice was on the tape, or the content of the tape. Anderson said he immediately recognized the voice as Janet Lee's. After the tape was played, the dispatchers criticized Lee, stating that she made sexually explicit comments and was flirtatious. Anderson paid little attention to these comments and considered them to be "sour grapes."

Following the meeting, Anderson decided to rescind his recommendation for Lee's promotion, based on his conclusion that Lee made the telephone call. A memorandum was prepared by Anderson's secretary and left in a sealed envelope in Lee's mailbox. Anderson also prepared a memorandum for the deputy executive director, Jeff Hamiel, and the executive director, Claude Schmidt, requesting that Lee's promotion be rescinded. Because Anderson would be gone until July, he arranged for Lee to deal with Hamiel in his absence. In the meantime, Lee's promotion was placed on hold pending an inquiry into the matter. At this time, the position of lead dispatcher had still not been authorized by the commission.

Lee heard rumors concerning the dispatchers' statements as soon as she returned from her vacation. Subsequently, Lee met with Hamiel and denied that she had made the telephone call. She requested to take a polygraph examination to prove her innocence.

Lee took a polygraph examination before an examiner of her choice. The MAC sent a letter to Lee stating that they would not

consider the polygraph test unless it was given by an approved examiner. Lee refused to take a second polygraph examination with an examiner acceptable to the MAC.

A tape recording was made of Lee's voice for submission to the FBI for a voice comparison analysis with the tape of the telephone call. A letter was also sent to the FBI concerning a threatening phone call made to an employee at home, and concerning the harassing telephone call received by the dispatcher at work. This letter requested the FBI's assistance in identifying the person or persons involved in the telephone calls. The letter did not specify Janet Lee by name. The FBI's analysis was inconclusive as to identification of the two voices, although aural similarities were noted.

Lee filed a grievance with the MAC requesting that she receive her expected promotion and raise. On October 11, 1985, Schmidt informed Lee that she would be offered the promotion to lead dispatcher. Lee did not accept the promotion at this time, because she believed that she was entitled to a greater raise and to compensation for the rumors and the delay in obtaining the promotion. Lee finally accepted the promotion in March 1986 and received full back pay at the increased salary from June 17, 1985, the date the position was officially authorized by the commission. Appellant's employment record contains no reference to the harassing phone call or any of the other derogatory comments made by her fellow employees.

Janet Lee served this law suit in 1986 after she had received the position as lead dispatcher. She moved to amend her complaint in July 1987 to add another defendant, fellow dispatcher Sue McKechnie, and to add punitive damages to her complaint. At this time, all respondents moved for summary judgment on all counts, which was granted by the trial court. The trial court also denied appellant's motion to amend the complaint. Janet. Lee appeals all aspects of the trial court's decision.

## ISSUE

Did the trial court err in granting summary judgment on all claims made by appellant?

## ANALYSIS

On appeal from summary judgment the appellate court determines whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn. 1979).

### Defamation

■ Appellant claims that she was defamed in numerous ways by the employees of MAC. She claims that she was slandered when the employees told her supervisor, Tim Anderson, at an office meeting that she had made a harassing phone call to them. She claims that further defamation occurred when Anderson sent a letter to her and to his supervisors stating that appellant had made this harassing phone call. Appellant further alleges that she was defamed when fellow employees made comments at a meeting and in personal conversations which occurred in the office, regarding alleged sexual affairs, the manner in which she got her job, and other comments regarding her character.

■ In order for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower her estimation in the community. *Stuempges v. Parke, Davis & Company*, 297 N.W.2d 252, 255 (Minn.1980). Slanders affecting a person in her business, trade, profession, office or calling are slanderous per se and actionable without any proof of actual damages. *Id.*

However, certain statements made in a business setting may not be actionable because of a qualified privilege. The following have been the elements and effects of conditional privilege in Minnesota:

The law is that a communication, to be privileged, must be made upon a proper

occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of·such proof the plaintiff cannot recover.

*Stuempges*, 297 N.W.2d at 256–57 (quoting *Hebner v. Great Northern Railway*, 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899)).

In applying this privilege, the Minnesota Supreme Court has held:

Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.

*McBride v. Sears Roebuck & Company*, 306 Minn. 93, 235 N.W.2d 371, 374 (Minn. 1975).

 From the facts in the present case, we conclude as a matter of law, that all communications regarding the harassing phone call come under this qualified privilege. The discussion of the telephone call at the regularly scheduled dispatcher meeting was made at a proper occasion. Additionally, all dispatchers had reasonable cause to believe Lee made the call, since they thought it sounded like her voice. There certainly is a proper purpose for informing a supervisor that a fellow employee, especially one who is soon to be promoted, may have made a harassing phone call to fellow workers. It follows, from this analysis, that any correspondence between respondent Anderson and other MAC employees regarding the phone call would also be subject to a qualified privilege.

Because we find the statements made in the meetings are subject to such a privilege, appellant must then prove actual malice before there can be a recovery. Actual malice in Minnesota is defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *Frankson v. Design*

*Space International*, 394 N.W.2d 140, 144 (Minn.1986) (quoting *McBride*, 306 Minn. at 98, 235 N.W.2d at 375).

Appellant has produced no facts which demonstrate that the qualified privilege was abused by Anderson or MAC management. By her own admission, appellant has been treated fairly in all respects by Anderson. Nor has appellant produced any evidence demonstrating malice on the part of respondents Foley and Johannes. Undisputed facts show the tape of the phone call was played without any mention that the dispatchers believed it was Lee's voice. Additionally, appellant has failed to come forward with any facts which would support her allegations that Foley and Johannes made malicious and defamatory statements about her at the meeting. Appellant could only state that Sue McKechnie, who is not a party to this suit, made the alleged statements at the dispatchers meeting.

Appellant additionally alleges that she was defamed by statements made by Foley and Johannes during work hours.

 Opinion is absolutely protected under the first amendment and is not actionable in a defamation action. *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). In determining whether a statement is fact or opinion, this court has used a multifactor test set out in *Janklow*. The four factors which must be considered as a whole are:

(a) the precision and specificity of the disputed statement (the more imprecise, the more likely opinion);

(b) the statement's verifiability (the less verifiable, the more likely opinion);

(c) the literary and social context in which the statement was made (including the entire communications tone, the use of cautionary language, the category of publication, its style of writing and intended audience); and

(d) the statement's public context (consideration of the public or political arena in which the statement was made).

*Capan v. Daugherty,* 402 N.W.2d 561, 563 (Minn.Ct.App.1987).

We find comments regarding appellant's social life or personal characteristics would not be considered facts under this test. As a matter of law, statements that appellant is a "fluffy," a "bitch," or flirtatious are too imprecise in nature to be actionable defamatory statements. *See Buckley v. Littell,* 539 F.2d 882 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (calling someone a "fascist" is indefinite and an opinion and therefore protected by the first amendment). In this particular case, the social context of these statements, office gossip and banter, would not lead a listener to believe them as statements of fact.

The trial court did not err in granting summary judgment on appellant's defamation claim where the alleged statements were mere opinions or qualifiedly privileged statements made without malice.

The trial court correctly excluded from consideration partial transcripts, made by appellant, of co-workers' conversations during business hours. The trial court correctly believed that the transcripts were inadmissible under Minn.R.Evid. 1003 because they are inaccurate duplicates. Even though appellant transcribed fully every derogatory comment made about her, she did not transcribe the tapes in full. Because the transcripts are not true and accurate copies, and therefore inadmissible evidence, they cannot be considered in a summary judgment motion.

### Breach of Contract

Appellant claims that respondent MAC breached a contract by not following the policy guidebook in regard to her promotion, and by not giving her a substantial raise, which she expected.

Appellant claims that the MAC's personnel policy handbook has specific provisions which constitute a binding contract.

A personnel policy handbook may become enforceable as an employment contract if it meets the requirements for formation of a unilateral contract. *Kulkay*

*v. Allied Central Stores, Inc.,* 398 N.W.2d 573, 576 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn.Feb. 13, 1987). The offer must be sufficiently definite in form and must be more than employers' general statement of policy in order to constitute a contract. *Id.* at 576. Additionally, the offer or guidebook must be made known to the employee to be part of a unilateral contract. *Fitzgerald v. Norwest Corp.,* 382 N.W.2d 290 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn.Apr. 24, 1986).

We need not decide whether the MAC's policy guidebook is specific enough to constitute a unilateral contract, because from undisputed facts, no provisions of the guidebook were breached.

We agree with the MAC that the policy guidebook was followed in giving Lee a promotion and in following the grievance provisions. The demotion provisions of the guidebook do not apply in Lee's case because she was never demoted; Lee's promotion was merely put on hold for several months. While her promotion was on hold, Lee retained her prior position and wage rate. A delay in giving an employee a promotion does not constitute a demotion.

Furthermore, from undisputed facts, the grievance provisions of the guidebook were followed in Lee's case. Lee filed a grievance with the MAC and eventually received back pay at the higher approved rate from June 17, 1985, the date the Commission approved the position. Appellant does not dispute that she received full back pay. Appellant received everything she could be expected to receive including: the promotion, a raise, back pay, and no mention of the phone call in her file. Lee failed to present any evidence in affidavits, depositions or answers to interrogatories to support her claim that the provisions of the guidebook were breached or that she sustained any damages.

Appellant's expectation of a greater raise than she actually received also does not constitute a breach of contract. By her own admission, Lee states that Anderson never told her what the pay for the lead dispatcher would be, and that she

knew that the Commission had not set the pay rate. She also admits that she had heard from others in the office that the lead dispatcher position would entitle her to a substantial raise. Based upon these facts, as a matter of law, there was no offer or unilateral contract which would have entitled Lee to a greater raise than she received.

The trial court correctly granted summary judgment on appellant's breach of contract claim.

### Interference with Contractual Rights

Appellant claims that respondents Johannes and Foley intentionally interfered with her contractual rights by playing the tape of the phone call, by making disparaging remarks about her and by generally trying to prevent her from receiving the promotion.

■ Recovery may be had for inducing breach of contract by establishing 1) the existence of a contract; 2) alleged wrongdoers knowledge of the contract; 3) his intentional procurement of its breach; 4) without justification; and 5) damages resulting therefrom. *Royal Realty Co. v. Levin,* 244 Minn. 288, 69 N.W.2d 667, 671 (1955).

■ Appellant has not presented any facts to prove intentional interference with contractual rights. Appellant has failed to provide evidence that respondents' acts legally caused appellant to lose any contractual rights. There are no facts which show that any of Foley's or Johannes' comments interfered with Lee's position at MAC; nor is there any evidence that Lee sustained any damages by her co-workers' actions. We hold that Lee received everything which she had a contractual right to expect. The co-workers may have wanted to interfere with Lee's contractual rights, but if so, they failed in their attempts.

### Covenant of Good Faith and Fair Dealing

■ Lee alleges that her employment contract with MAC contains an express or implied covenant of good faith and fair dealing. Appellant points to the language contained in the policy guide which states:

[The guide] is designed to provide day to day guidance in dealing effectively, fairly and uniformly with the Commission's most important resource—the men and women who make up the staff.

■ Implied covenants of good faith and fair dealing are not favored in Minnesota, and courts have not read an implied covenant of good faith and fair dealing into employment contracts. *See Hunt v. IBM Mid America Employees Federal Credit Union,* 384 N.W.2d 853, 858 (Minn.1986). It is a question for a court to determine as a matter of law whether general policy statements found in employment manuals rise to the level of contractual requirements. *Id.* at 859.

"Summary judgment is appropriate where even accepting a plaintiff's version of the facts as true, the plaintiff cannot establish a modification of the at-will employment doctrine." *Simonson v. Meader Distribution Co.,* 413 N.W.2d 146, 148 (Minn.Ct.App.1987) (quoting *Corum v. Farm Credit Services,* 628 F.Supp. 707, 715 (D.Minn.1986)).

The trial court was correct in finding that as a matter of law the policy guide statement is not sufficiently definite to meet contractual requirements of a unilateral offer. Mere general statements of policy are not sufficient to form a covenant of good faith and fair dealing.

### Negligent Performance of a Contract

■ Appellant alleges that MAC has negligently performed its contractual obligations in two respects: 1) by initiating or allowing an FBI file to be created on the phone call; 2) by investigating the phone call in a negligent manner and allowing others to become aware of the investigation. There is no merit to appellant's claim.

On numerous occasions, Minnesota courts have declined to convert malicious, willful or bad faith violations of a person's contractual rights into tort actions. The Minnesota Supreme Court has stated "a

malicious or bad-faith motive in breaching a contract does not convert a contract action into tort action." *Wild v. Rarig*, 302 Minn. 419, 441, 234 N.W.2d 775, 790 (1975) *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), *reh'g denied*, 425 U.S. 945, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976). Furthermore, the Minnesota cases cited by appellant concern obligations of contractors in building homes or other projects for the landowners. These negligent construction cases are more similar to warranty cases than to breach of employment contracts cases. Appellant has alleged no facts which would substantiate a claim for negligent performance of a contract.

### Violation of Minn.Stat. § 181.75

■ Appellant claims that respondent MAC violated Minn.Stat. § 181.75, when Jeffrey Hamiel asked her to take a second polygraph test, and by the voice analysis done by the FBI. Minn.Stat. § 181.75, subd. 1 (1986) provides in part:

No employer or agent thereof shall directly or indirectly solicit or require a polygraph, voice stress analysis, or any test purporting to test the honesty of any employee or prospective employee.

Appellant has waived the application of this statute by initially asking, on her own accord, to submit to a polygraph examination. All facts presented show that further statements made and actions taken by the MAC employees were necessary to clarify the MAC's position as to the acceptability of test results. As a matter of law, the statute was not violated after appellant, on her own initiative, requested a polygraph examination.

### Intentional Infliction of Emotional Distress

■ Four elements are necessary to sustain a claim for intentional infliction of emotional distress: 1) the conduct must be extreme and outrageous; 2) the conduct must be intentional or reckless; 3) it must cause emotional distress; and 4) the distress must be severe. *Bohdan v. Alltool Manufacturing Company*, 411 N.W.2d 902, 907–08 (Minn.Ct.App.1987), *pet. for*

*rev. denied* (Minn. Nov. 13, 1987). The type of conduct referred to as "extreme and outrageous" must be so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community. *Haagenson v. National Farmers Union Property and Casualty Co.*, 277 N.W. 2d 648, 652, n. 3 (Minn.1979).

■ If the claimed distress is the type people commonly encounter and endure in their lives, the claim should not be submitted to a jury. *Cafferty v. Garcia's of Scottsdale, Inc.*, 375 N.W.2d 850, 853 (Minn.Ct.App.1985). Summary judgment is proper where a plaintiff does not meet the high threshold standard of proof needed for an intentional infliction of emotional distress claim. *See Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 379 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Nov. 1, 1984).

■ It is clear that the gossip by Lee's fellow employees is the type commonly encountered in people's daily lives. Even if the gossip was more severe than usually encountered, it is not so atrocious that it passes the boundaries of decency and is utterly intolerable. Additionally, the delay in Lee's promotion for investigative purposes is not extreme and outrageous conduct, especially when Lee eventually received the promotion with full back pay. We agree with the trial court that appellant failed to offer sufficient evidence of material facts that any conduct was extreme, outrageous and utterly intolerable in a civilized community, or caused Lee severe emotional distress.

### Negligent Infliction of Emotional Distress

■ For a person to be successful on a claim for negligent infliction of emotional distress, it must usually be shown that the person was in a zone of danger of physical impact, reasonably feared for her safety, and consequently suffers severe emotional distress with resultant physical injury. *Stadler v. Cross*, 295 N.W.2d 552, 553 (Minn.1980). An exception to the general rule is that a person "may recover damages for mental anguish or suffering

for direct invasion of [her] rights, such as defamation, malicious prosecution, or other willful, wanton or malicious conduct." *Bohdan*, 411 N.W.2d at 907.

There is no basis for this cause of action under the facts of this case. Appellant's claim for defamation can not withstand summary judgment, thus causing this claim to fail also. Additionally, no material facts exist which would show that appellant was in a "zone of danger" or feared for her safety.

*Amendments to Appellant's Complaint*

The trial court did not err in denying appellant's motion to add a new defendant. The additional claim for punitive damages was also properly disallowed by the trial court. Appellant's motion to amend her complaint was untimely.

## DECISION

The trial court correctly granted summary judgment in dismissing all counts of appellant's complaint.

AFFIRMED.