NUMBER 13-00-389-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

__________________________________________________________________


DAVID B. MOORE , Appellant,


v.


ARTHUR ANDERSEN, L.L.P. AND LAURA MAWHINNEY , Appellees.

__________________________________________________________________


On appeal from the 44th District Court

of Dallas County, Texas.

__________________________________________________________________


O P I N I O N

Before Justices Hinojosa, Rodriguez, and Hill (1)

Opinion by Justice Hill


David Moore appeals from a summary judgment that he take nothing in his claims of sex discrimination and harassment,
wrongful discharge, defamation, and intentional infliction of emotional distress against Arthur Andersen, L.L.P., and Laura
Mawhinney. He contends in four points that the trial court erred by granting summary judgment as to each of those four
claims. We affirm because the trial court did not err by granting summary judgment as to Moore's claims.

Moore sued appellees after he was fired by Andersen. His claims for defamation and intentional infliction of emotional
distress were made against both appellees, while his claims for sex discrimination and harassment and wrongful discharge
were directed solely against Andersen. In response to his claims as they are outlined above, Appellees filed a motion for
summary judgment, a motion to which Moore responded. As previously noted, the trial court granted summary judgment
that Moore take nothing as to all of his claims.

Appellees' motion for summary judgment reflects that it is brought both as a traditional and as a no-evidence motion for
summary judgment because it states that it is brought under Texas Rules of Civil Procedure 166a(b) and 166a(i). Further,
as to each cause of action brought by Moore, it alleges that there is no evidence as to an essential element of each claim, as
required by Rule 166a(i). See Tex. R. Civ. P. 166a(i). Rule 166a(i) of the Texas Rules of Civil Procedure provides that:

After adequate time for discovery, a party without presenting summary judgment evidence may move for summary
judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an
adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. 
The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of
material fact.

Id. 

When such a motion is presented, the movant does not bear the burden of establishing each element of its own claim or
defense. See Ford v. City State Bank of Palacios, 44 S.W.3d 121, 128 (Tex. App.--Corpus Christi 2001, no pet.). The
burden then shifts to the nonmovant to present enough evidence to be entitled to a trial: evidence that raises a genuine fact
issue on the challenged elements. Id. If the nonmovant is unable to present enough evidence, the trial judge must grant the
motion. Id.

A no-evidence motion for summary judgment is improperly granted if the nonmovant presents more than a scintilla of
probative evidence to raise a genuine issue of material fact. Id. Less than a scintilla of evidence exists when the evidence
is so weak as to do no more than create a mere surmise or suspicion of a fact. Id. More than a scintilla of evidence exists
when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. Id. 
We first consider whether Appellees were entitled to a no-evidence motion for summary judgment. 

 SEXUAL HARASSMENT AND DISCRIMINATION

With respect to Moore's claim of sexual harassment and sex discrimination, Andersen maintains in its motion for summary
judgment that Moore can produce no evidence that Mawhinney created a sexually hostile work environment or
discriminated against him because of his sex. Moore's claim is a statutory claim based upon the Texas Human Rights Act,
Texas Labor Code section 21.001, et seq., which provides in section 21.051 as follows:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin,
or age the employer:

1. fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual
in connection with compensation or the terms, conditions, or privileges of employment; or

2. limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to
deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code ANN.§ 21.051 (Vernon 1996). 

We will first consider Moore's contentions as they relate to his claim against Andersen for sex discrimination and
harassment. According to Moore's affidavit, attached to his response, Mawhinney, his project manager at Andersen, gave
him a memorandum that she had prepared for the file. In that memorandum, Mawhinney discussed observations of
Moore's work and behavior. She observed that Moore spent "too much time 'chatting' with multiple female client personnel
at the client site. This was perceived as flirtatious behavior by both the client and Barry's project team member and was
brought to the attention of the project manager at a client dinner meeting." In addition to her observation, Mawhinney's
memo contained the following under the heading "Action" with respect to that observation:

On Wednesday, July 1st, 1998, Laura discussed this issue with Barry at the New Orleans airport. I emphasized the
importance of Barry maintaining professional relationships with client personnel and focusing on project tasks, (which is
what the client is paying AA to do). Additionally, I told Barry, that while developing client relationships are important, that
he should be focusing mainly on tasks at his level, and when working on relationship-building, that it should occur more
often with the client's managers, rather than the accounting clerks. It was reported to me that Barry's behavior changed in
the right direction after our discussion. 

Mawhinney further stated in the memo that:

Throughout the week, I observed Barry engaged in multiple conversations with multiple female employees, sometimes
lasting 20-30 minutes at a time. In the course of one day, I would suspect that he worked six of eight hours. Barry should
have had a full week's worth of work to do, but if for some reason he did not, he never bothered to offer assistance to his
project team member with demo scripts, or ask for additional work. 

The bulk of the memo was directed to other types of examples of poor job performance on Moore's part. As can be seen,
Mawhinney referred to Moore as Barry in the memorandum.

Moore states in his affidavit that on the next working day, Monday, July 27, 1998, he went to Andersen's office of human
resources and talked to Linda Ferguson. He indicates that after telling her he wanted to talk to her about sexual harassment,
he complained that Mawhinney was directing agitated and antagonistic behavior toward him and was creating a hostile
work environment. Moore says that he prepared a detailed rebuttal of the charges in Mawhinney's memo and followed the
instructions given him by Ferguson. The affidavit reflects that on the following Friday, July 31, 1998, Moore was called to
the office of Andersen's Director of Human Resources, Scott Wilson, who advised him that it "appears you are a flirt." 
According to Moore, Wilson then summarily fired him for sexual harassment. Moore observed in his deposition that
several employees at Andersen declined to read his response to Mawhinney's memo, including Jeff Valentine and Paul
Shultz. 

Andersen, in a letter to the Texas Workforce Commission, stated that Moore was fired for sexual harassment and
forwarded its sexual harassment policy to the commission, but Wilson, Andersen's Director of Human Resources, indicated 
he had told the person who wrote the letter that it was incorrect and should have read that he was terminated for
unprofessional conduct. Wilson stated that the person who wrote the information got it from the file by looking at the notes
he prepared, but that he did not know how she concluded that Moore was terminated for sexual harassment. Wilson
acknowledged that Andersen has no code number for termination for sexual harassment. Wilson indicated that the
employee who made the error is a competent employee and that he was not aware of it ever happening before. 

In a telephone conversation between Wilson and Moore after Moore's termination, Wilson related to Moore that he had
interviewed seven women. He told Moore that they had indicated that Moore asked them about whom they were dating
and whether they were dating anyone. Wilson told Moore that all of them felt very uncomfortable in that situation. Moore
denied the accusations, but Wilson told him that he knew of at least two instances in which there were others who
overheard the conversation. Although Wilson did not, in his notes, put the word "uncomfortable" in quotes, he indicated
that one or more of the women used that term, that it was not just his term. Wilson also indicated in his deposition that he,
Schultz, and Ja Chriesman, another Andersen employee, would have read Mawhinney's memo. He stated that he had read
Moore's response, that he thought Shultz read it, and that he would have thought that Chriesman and Mawhinney read it. 
However, he acknowledged that he did not know for sure that they had read it.

In her deposition, Mawhinney testified that, prior to working on the Friede Goldman project with Moore, she had never
observed him engaging in flirtatious behavior and no one had told her that he had. As to her observations on the project,
Mawhinney indicated that she would not say whether she had or had not observed flirtatious behavior. She stated that she
suspected that flirtatious behavior was occurring. Mawhinney testified concerning a meeting she had with Wilson and 
Chriesman on Thursday prior to Moore's termination. She had learned of the meeting while out of town through an urgent
voice mail from Wilson's office assistant wanting to know when she and Chriesman would be returning to the office. When
they returned to town, she and Chriesman went directly to Wilson's office. She indicated that she did not, after the meeting,
give any names of complaining females to Nancy Werner, the Andersen employee who investigated the matters involved
here, because she thought that "[T]hey already had most of all the evidence they apparently needed." Mawhinney stated in
the deposition that she played no role whatsoever in Moore being fired. 

Werner investigated the complaints concerning Moore prior to his termination and verified that Moore made inappropriate
comments to female employees that made them feel uncomfortable and that at least one employee indicated that she would
never staff her projects with a female who was subordinate to him. At Moore's request, Wilson personally investigated the
allegations after he terminated Moore. 

Moore contends that a memo from Werner "states unequivocally" that she got the names of complaining women from
Mawhinney, but our review of that memo shows that it does not reflect that Mawhinney gave her the names, only that she
began her investigation after meeting with Mawhinney, Chriesman, and Wilson.

In support of his conclusion that he filed a sexual harassment complaint, Moore refers us to his deposition testimony that he
went to talk to Linda Ferguson about sexual harassment, then told her that Mawhinney was acting very antagonistically
toward him. Moore could not recall if he had given Ferguson any examples. 

Moore stated in his deposition that he was replaced by a female whose qualifications were not as good as his for the job. 
He did not elaborate as to how she was less qualified nor give any source of his knowledge as to her qualifications. 

Under the Texas Commission on Human Rights Act, it is unlawful for an employer to discriminate against an individual
with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability,
religion, sex, or national origin. Tex. Lab. Code Ann. § 21.051 (Vernon 1996) (formerly Tex. Rev. Civ. Stat. Ann. art.
5221k, § 5.01(1)); Garcia v. Schwab, 967 S.W.2d 883, 885 (Tex. App.--Corpus Christi 1998, no pet.). The Human Rights
Act is modeled after federal law for the purpose of executing the policies embodied in Title VII of the federal Civil Rights
Act of 1964. See Tex. Labor Code Ann. § 21.001 (Vernon 1996); Garcia, 967 S.W.2d at 885. One form of employment
discrimination is sexual harassment. Garcia, 967 S.W.2d at 885. 

Moore's sexual harassment claim is a hostile work environment form of sexual harassment. Such a claim includes the
following elements: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome sexual
harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a "term,
condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to
take remedial action. Id. Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule,
and insult that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. 
Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 64, 67 (1986). Conduct that is not severe enough to create a work
environment that a reasonable person would find hostile or abusive will not trigger Title VII or its Texas equivalent. 
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Garcia, 967 S.W.2d at 885. Whether an environment is "hostile" or 
"abusive" can be determined only by reviewing all the circumstances, which may include the frequency of the conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance. Harris, 510 U.S. at 23; Garcia, 967 S.W.2d at 885-86. Considering all
of the summary judgment evidence, including that we have outlined above, we hold that Moore has failed to present
evidence showing that he was subjected to a hostile work environment of the severity required to maintain his claim for
sexual harassment. 

We now turn to Moore's claim of sexual discrimination. The plaintiff in a Title VII trial must carry the initial burden of
establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 (1973). Such a
prima facie case requires a showing that (1) he is a member of a protected class; (2) he was otherwise qualified for his
position; (3) he was discharged by the defendant; and (4) the respondent replaced him with someone outside his protected
class. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). We hold that Moore presented a prima facie
case. 

Once Moore presented a prima facie case, it was appellees' burden to produce evidence that the plaintiff was rejected, or
someone else was preferred, for a legitimate nondiscriminatory reason. Id. Andersen and Mawhinney presented evidence
that Moore was terminated because of speaking with women in an inappropriate way that made them feel uncomfortable. 
Once the appellees met that burden, the presumptions and burdens discussed in McDonnell Douglas disappeared. Id. at
142-43. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the
plaintiff remains at all times with the plaintiff. Id. at 143. Whether judgment as a matter of law is appropriate depends on
a number of factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the
employer's explanation is false, and any other evidence that supports the employer's case that might properly be considered
on a motion for judgment as a matter of law. Id. at 148-49. In making that determination we are to review the record as a
whole. Id. at 150. 

In this case there is nothing particularly remarkable about Moore's prima facie case. He merely established that he was a
male, was otherwise qualified for his job, was terminated, and was replaced by a female. He was terminated following an
investigation showing that he engaged in conversations with specified individuals in which he made statements and asked
questions that were inappropriate in a business setting and that made women uncomfortable. Moore never presented
evidence showing that these specific accusations were untrue or that such information was not in fact presented to
Andersen. Therefore, he presented no evidence showing that the nondiscriminatory reason for firing him was pretextual.

In urging that he presented evidence showing that Andersen's reason was pretextual, Moore refers to evidence showing that
Andersen initially reported he was fired for sexual harassment, then changed the reason to unprofessional conduct,
asserting that the original report was a mistake. Regardless of whether Andersen chose to call it sexual harassment or
unprofessional conduct, evidence showed Andersen terminated Moore based on certain conduct on his part that Moore
never denied. Inasmuch as Moore never denied that conduct, he presented no evidence that the reason for his firing was
pretextual. 

Moore cites several examples of discrimination on the part of Andersen. We will consider all of these individually. First,
Moore argues that Andersen fired him for sexual harassment, without a shred of evidence to support the firing. During his
discussion, he refers to the investigation by Werner, but does not mention that her investigation substantiated the
observations made by Mawhinney in her memo. He indicates that there never was a proper investigation, but does not
explain why Werner's investigation was improper. 

Moore complains that Andersen immediately acted upon Mawhinney's memo to discharge him. He does not mention that
he was not fired until Werner's investigation confirmed the observations in Mawhinney's memo. He also suggests that his
claim of sexual harassment against Mawhinney was ignored. While an investigation showed the justification for his being
fired for a nondiscriminatory reason, Moore has not shown that he ever indicated to Andersen in what way, if any,
Mawhinney was supposed to have been guilty of sexual harassment or discrimination against him. Further, there is no
evidence in the record indicating that she discriminated against Moore in any way on the basis of his gender or committed
any other act that was improper under the Texas Labor Code or Title VII. 

Moore states that he was replaced by a female, a female who he says is not as qualified as he for the position. As
previously noted, he never says in what way she was less qualified or what the source of his knowledge as to her
qualifications might be.

Moore relates that Andersen retaliated against him by firing him only four days after he filed sexual harassment charges
against Mawhinney, in violation of Andersen's own policy. Other than Moore's conclusory statement that he filed a sexual
harassment complaint, Moore's own affidavit indicates that he talked to Linda Ferguson in Andersen's human resources
department about sexual harassment, then proceeded to tell her that Mawhinney was directing agitated and antagonistic
behavior toward him and was creating a hostile work environment. Even if Moore did file a claim of sexual harassment
against Mawhinney, there is nothing to suggest that he ever indicated to Ferguson or anyone else any facts that would serve
as a basis for believing that any antagonistic or hostile behavior on Mawhinney's part was directed at him because of his
gender. 

Finally, Moore urges that Andersen discriminated against him by contesting his application with the Texas Workforce
Commission for employment benefits with a letter falsely charging him with sexual harassment. Although Andersen chose
to characterize the reason for Moore's termination as unprofessional conduct rather than sexual harassment, the nature of
conduct for which it terminated Moore would, if sufficiently severe, constitute sexual harassment. Even if it were not so
severe, and even if the letter was not sent in error, as urged by Andersen, there is nothing in the record indicating that the
sending of this letter constituted discrimination against Moore based upon his gender. We find that there is no more than a
scintilla of evidence that Moore ever actually filed a sexual harassment complaint against Mawhinney, and, even if he did,
no more than a scintilla of evidence that Andersen or Mawhinney discriminated against Moore on the basis of gender. We
overrule point one. 

WRONGFUL DISCHARGE

Moore urges in point two that the trial court erred in granting summary judgment on his claim for wrongful discharge. The
appellees urge that he has failed to show a binding contract of employment that would modify Moore's status as an
employee at will. The general rule in Texas is that, absent a specific agreement to the contrary, employment may be
terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all. Montgomery County
Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998). For such an employment contract to exist, the employer must
unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified
circumstances. Id. In support of his argument that there was such an employment contract, Moore refers to that portion of
Andersen's anti-harassment policy that states, "We will support any employee who believes he or she has been unlawfully
harassed by his or her supervisor, coworker or third party in a work-related situation." We do not view this as an
unequivocal statement by Andersen that it was bound not to terminate an employee except under clearly specified
circumstances. Consequently, the trial court did not err in granting summary judgment on this issue. 

Moore relies upon the cases of Morgan v. Jack Brown Cleaners, Inc., 764 S.W.2d 825 (Tex. App.-Austin 1989, writ
denied) and Goodyear Tire and Rubber v. Portilla, 879 S.W.2d 47, 52 (Tex. 1994). We first note that in Morgan the court
did not consider whether the employer's promise that if a certain department ever closed, it would find a job for her within
the company, was definite enough to constitute an enforceable contract. Brown, 965 S.W.2d at 503. The Supreme Court
disapproved of the holding inMorgan to the extent that it was inconsistent with Brown. Id. In Goodyear, which was also
decided before Brown, the court relied on Morgan as probably "[The] Texas case closest in point." Goodyear, 879 S.W.2d
at 51. In any event, we find both cases distinguishable because in each of those cases there was a specific agreement not to
terminate the employee under a specific circumstance, whereas in the case at bar there is no specific agreement not to
terminate the employee. We overrule point two. 

DEFAMATION

Moore contends in point three that the trial court erred in granting summary judgment on his claim for defamation. He
insists that Mawhinney accused him of flirtatious behavior in her memo. In their motion for summary judgment, appellees
contend that there is no evidence that they published a defamatory statement about Moore because the term "flirtatious" is a
nonactionable opinion that is not capable of a defamatory meaning. As previously noted, the memo states that too much
time spent chatting with female personnel was perceived by the client and Moore's team member as flirtatious behavior. 
Later in the memo, Mawhinney states that Moore needed to improve his professionalism. She said, "Whether his behavior
has been flirtatious or not, if someone perceives that it is, then there is a problem." When one reads the memo as a whole,
one sees that the memo does not state that Moore is flirtatious, only that he is perceived to be by some, and that such a
perception constitutes a problem. We conclude, therefore, that Mawhinney did not publish a defamatory statement against
Moore. 

Even if Mawhinney did publish a statement that Moore was flirtatious, it has been held that such a statement is too
imprecise in nature to be an actionable defamatory statement. Lee v. Metro. Airport Comm., 428 N.W.2d 815, 821 (Minn.
App. 1988).

In support of his argument that a publication that he was flirtatious would be an actionable defamatory statement, Moore
relies upon the case of Scribner v. Waffle House, Inc., 14 F. Supp.2d 873, 915 (ND 1998), vacated at 62 F. Supp.2d 1186
(1999). Under the heading "Defamatory Meaning" Moore states that "A charge that the Plaintiff was "vulgar and
flirtatious" was found to be untrue, and supported (together with other facts) a judgment in excess of $6 million for the
Plaintiff for sexual harassment, defamation and intentional infliction of emotional distress." Unlike Moore, Therese
Scribner, the plaintiff in that case, was a victim of pervasive sexual harassment by a number of individuals over an
extended period of time. Scribner, 14 F.Supp.2d at 891. Although the trial court found that witnesses in the trial lied when
they accused Scribner of being vulgar and flirtatious, Scribner's claim of defamation did not involve any statements
accusing her of being a flirt or being flirtatious. Id. at 935. Furthermore, as noted in the citation, the opinion in Scribner
has been vacated. Scribner v. Waffle House, Inc., 62 F.Supp.2d 1186 (N.D. 1999). We overrule point three.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Moore argues in point four that the trial court erred by granting summary judgment on his claim for intentional infliction of
emotional distress. In response to Moore's claim for intentional infliction of emotional distress, the appellees contend in
their motion for summary judgment that there was no evidence that they engaged in any conduct that constitutes intentional
infliction of emotional distress. 

To recover damages for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted
intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff
emotional distress; and (4) the resulting emotional distress was severe. GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 611
(Tex. 1999) 

To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Id. 
Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct. Id. at 612. Mere insults,
indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous
conduct. Id. 

Texas courts have adopted a strict approach to intentional infliction of emotional distress claims arising in the workplace,
relying on the fact that, to properly manage its business, an employer must be able to supervise, review, criticize, demote,
transfer, and discipline employees. Id. Although many of these acts are necessarily unpleasant for the employee, an
employer must have latitude to exercise these rights in a permissible way, even though emotional distress results. Id. 
Consequently, in Texas, a claim for intentional infliction of emotional distress does not lie for ordinary employment
disputes. Id. The extreme and outrageous conduct required in such a cause of action in the workplace exists only in the
most unusual of circumstances. Id. at 613. The evidence Moore has presented in response to the appellees' motion for
summary judgment is evidence of an ordinary employment dispute, not of extreme and outrageous conduct of such a nature
as is required to maintain a claim for intentional infliction of emotional distress. 

Moore claims that the facts in this case are similar to those in GTE Southwest. To the contrary, the facts in GTE Southwest
show a much more extreme situation. The supervisor in GTE Southwest was a former U. S. Army supply sergeant who
committed ongoing acts of harassment, intimidation and humiliation and who engaged in daily obscene and vulgar
behavior. Id. at 608, 617. The supervisor created a workplace that was a "den of terror" for the employees, purposefully
humiliating and intimidating the employees, repeatedly putting them in fear of their physical well-being. Id. His abusive
conduct was common, not rare. Id. Our opinion does not conflict with GTE Southwest. 

Moore also relies upon the case of Bushell v. Dean, 781 S.W.2d 652 (Tex. App.--Austin 1989), rev'd in part on other
grounds, 803 S.W.2d 711 (Tex. 1991). In that case Dean's supervisor, Bushell, over a four-month period brought her
things for breakfast, called her "My Sweet Mary," and told off-color jokes and talked about his marital sex problems with
her and other employees. Id. at 657-58. He told Dean that he liked her split skirt and remarked about the shape of her
body. Id. at 658. Bushell touched her several times. Id. Dean claimed that once, when Dean hugged him to thank him for
a favor, Bushell tried to kiss her. Id. The next month, Bushell rubbed her neck although she did not ask him to and he had
made no offer to do so. Id. He stopped when she asked him to. Id. During the next two months Bushell poked Dean in
the ribs two or three times. Id. Bushell told Dean he loved her and desired a sexual encounter. Id. Subsequently, on two
separate occasions, Bushell told her of his love and desire for sexual relations. Id. When Dean publicly rejected his
advances, Bushell became very formal toward Dean, referring to her as "Mrs. Dean" and speaking to her only of business
matters. Id. Later, when Bushell shouted at Dean during a dispute regarding a trucker's strike, she resigned. Id. at 654. 
The court held that it was for the jury to determine whether Bushell's conduct was extreme and outrageous. Even ifBushell
was correctly decided, it is distinguishable because it involved overt sexual harassment over an extended period of time,
whereas the evidence presented by Moore does not. 

Moore states that Bushell was cited with approval by the Texas Supreme Court in Wornick Co. v. Casas, 856 S.W.2d 732
(Tex. 1993). In Wornick, Casas's employer, Right Away Foods Corporation, a wholly owned subsidiary of the Wornick
Company, terminated her and had her escorted off the premises by a security guard. Id. at 734. This was not standard
company policy for salaried employees such as Casas. Id. Casas spoke to the president of Right Away on her way out. Id. 
When Casas told him she disputed the allegations against her, he promised her a later meeting to discuss the matter, but he
never set up the meeting. Id. He led her to believe that she would be on leave of absence rather than terminated. Id. 

An amicus curiae, the National Employment Lawyers Association, cited Bushell as a case where courts had found
outrageous conduct in the employment setting. Id. at 735-36. Holding that the evidence was insufficient to show that
Right Away's conduct was extreme or outrageous, the court distinguishedBushell, just as we have done, on the basis that it
involved repeated or ongoing harassment of an employee. Id. at 736. We disagree with Moore that this constitutes citing
Bushell with approval. We overrule point four. In view of our determination that Appellees were entitled to a no-evidence
summary judgment, we need not consider whether they were entitled to a traditional motion for summary judgment. 

The judgment is affirmed.



______________________________

JOHN HILL,

Senior Justice



Do not publish .

Tex. R. App. P. 47.3(b).



Opinion delivered and filed

this 23rd day of August, 2001.

1. Senior Justice John Hill assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't
Code Ann. § 74.003 (Vernon 1998).